UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MARC FIEDLER, )
 )
Plaintiff, )
 )
v. ) CV-08-236-B-W
 )
OCEAN PROPERTIES, LTD., )
 )
Defendant. )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This case presents the difficult question of when a disabled plaintiff has standing to sue under the Americans with Disabilities Act (ADA). Marc Fiedler claims he is deterred from staying at Ocean Properties' hotel because of an ADA violation and would stay there should the hotel become ADA compliant. Cognizant of the need for Mr. Fiedler to point to specific facts to establish standing to sue, applying the procedural obligation to view those facts in the light most favorable to Mr. Fiedler, aware of the congressional mandate not to overburden ADA claimants, and consistent with the Supreme Court's directive to take a broad view of standing in civil rights cases, the Court concludes that Mr. Fiedler has survived by the very barest of margins the hotel's motion for summary judgment on standing grounds.

## I. STATEMENT OF FACTS[1]

In late June or early July 2006, Marc Fiedler, a Washington D.C. resident, made a week-long reservation (from August 8-16) to stay in a ground floor, wheelchair-accessible room with an ocean view at The Harborside, a luxury hotel located in Bar Harbor and owned by Ocean

[1] The Statement of Facts reflects Mr. Fiedler's version of events. Although Ocean Properties contests several facts, when reviewing a motion for summary judgment the Court construes all contested facts in favor of the non-moving party. *Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 41 n.2 (1st Cir. 2009) (stating that although the defendant contests several of the plaintiff's factual allegations, the Court "must take" the plaintiff's version of events as true).

Properties. *Def.'s Statement of Material Facts* ¶¶ 1, 5, 8 (Docket # 22) (*Def.'s SMF*).[2] Mr. Fiedler states that he selected the hotel based on its website and a review in Fodor's Travel Guides, based on its location, harbor views, and recent renovations. *Id*. ¶ 4.

Mr. Fiedler is confined to a wheelchair, and after making the reservation, he requested information to confirm the accessibility of the room. *Id*. ¶¶ 2, 12. In particular, Mr. Fiedler requested information regarding the entrance-door clearance, clearance around the bed, height of the bed, the height of the tracks for the exterior sliding door, size of the balcony, bathroom knee clearance, height of the towel rack, width of the closet, height of the closet rack, and knee clearance of the desk. *Id*. ¶ 13.[3]

On July 12, 2006, Chris Moulton, an Assistant General Manager at The Harborside, gave Mr. Fiedler the requested information by email. *Id*. ¶ 14. Mr. Moulton stated that the exterior sliding door to the balcony was set on tracks raised five and one-half inches above the floor but Mr. Fiedler would be able to access the balcony via a portable ramp that The Harborside would install. *Id*. ¶ 15; *Pl.'s SAF* ¶ 91. In a telephone conversation the next day, Mr. Moulton told Mr. Fiedler that the ramp would have the following characteristics: it would have no handrails,

---

[2] Mr. Fiedler alleges that although he "strongly preferred a room on the highest possible floor with a balcony, for the best possible view of the Bay, he was assigned without explanation to a ground floor room with a patio." *Pl.'s Objection to Def.'s Mot. for Summary J.* at 9 (Docket # 33) (*Pl.'s Objection*). This factual allegation is not found in the Plaintiff's Complaint. *Compl.* (Docket # 1). But his request for an upper floor room is contained in some of his statements of material fact, which The Harborside admitted, and Mr. Fiedler repeatedly refers to the denial of his upper room request throughout his filings. *Pl.'s Resp. to Statement of Material Facts with Statement of Additional Facts* ¶¶ 86, 94, 98 (Docket # 30) (*Pl.'s SAF*); *Def.'s Resp. to Pl's Statement of Additional Facts* ¶¶ 86, 94, 96 (Docket # 40) (*Def.'s SAF*).

To the extent Mr. Fiedler is pressing this issue as evidence of the hotel's discrimination, he has failed to develop it. The Court is left with evidence that Mr. Fiedler requested an upper floor room and got a ground floor room. The Court has no basis to conclude that The Harborside's placement of Mr. Fiedler was related to his disability as opposed to the myriad of other reasons hotels assign rooms. After all, Mr. Fiedler was making a reservation in late June or early July for August, the height of the tourist season; it may just be that the upper floor rooms were taken.

[3] The parties refer to the ground floor room as having a "balcony," a term that more commonly means an elevated, railed platform. The ground floor "balcony" sounds more like a patio, a term the parties occasionally use, with direct access to a common lawn. Mr. Brestle (a hotel worker who spoke with Mr. Fiedler) used the term "pseudo-balcony," which adds to the imprecision. But it is access to the outside structure, not the nature of the structure that matters.

extend 66 inches into the room, block access to one side of the bed, and reach 66 inches over the balcony onto an uneven lawn. *Pl.'s SAF* ¶ 93.

On July 18, 2006, Mr. Fiedler spoke by telephone with General Manager Matt Brestle about his concerns regarding the adequacy of the ramp. *Id.* ¶ 98. Mr. Brestle confirmed that the ramp would extend 66 inches into the room, but he stated that the ramp would not compromise the room area and would lead to a "pseudo-balcony" built on the lawn. *Id.* ¶ 99. On July 19 and 21, 2006, Mr. Fiedler spoke with Eben Salvatore, whom Mr. Fiedler believed was an architect or engineer. *Def.'s SMF* ¶ 21; *Pl.'s SAF* ¶ 101.[4] Mr. Salvatore informed Mr. Fiedler that the 5 and one-half inches high track "was not necessary to protect guest rooms from wind or water damage." *Pl.'s Objection*.[5] Mr. Salvatore told Mr. Fiedler that the ramp was 66" long with a 60" landing in the guest room and a platform on the balcony; he also said it would not block access to either side of the bed. *Def.'s SMF* ¶¶ 24, 25. Mr. Fiedler requested that Mr. Salvatore send him scaled drawings of the proposed ramp; Mr. Salvatore did not comply with Mr. Fiedler's request. *Id.* ¶ 27; *Pl.'s SAF* ¶ 107.

During July 2006, in furtherance of his plan to vacation at The Harborside, Mr. Fiedler researched the availability and cost of various air-travel options between Washington, D.C. and Bar Harbor. *Pl.'s SAF* ¶ 104. He also researched attractions and restaurants in and around Bar Harbor. *Id*. On August 5, 2006, the last day he could cancel before incurring a cancellation

[4] Mr. Salvatore was Operations Manager at The Harborside, not an architect or an engineer. *Aff. of Eben Salvatore* at ¶ 7 (Docket # 23). The parties agree that Mr. Salvatore was the employee with the most knowledge of the portable ramp. *Def.'s SMF* ¶ 23; *Pl.'s SAF* ¶ 23.

[5] This fact is vigorously contested by the parties. Mr. Salvatore states that he "assured Mr. Fiedler that the patio door was necessary to protect the room from water damage" and that the raised threshold was in fact necessary. *Aff. of Eben Salvatore* ¶¶ 2, 5 (Docket # 23). Mr. Fiedler says that Mr. Salvatore told him the higher threshold was "not necessary to protect guest rooms from wind or water damage." *Aff. of Marc Fiedler* ¶ 50 (Docket # 31). The Court wonders why The Harborside would go to the trouble and expense of installing a higher threshold if not to prevent wind and water damage.

This factual dispute is not dispositive in any event. Even if the weather exception applied, The Harborside would be required to provide equivalent access and Mr. Moulton's statements about the nature of the ramp generate a factual question as to whether the ramp does so.

charge and three days before he was set to stay, Mr. Fiedler canceled his reservation at The Harborside. *Def.'s SMF* ¶ 31. Mr. Fiedler states that he did so because he decided he should not risk expending time, money, and substantial effort traveling to The Harborside on the hope that the facility would be brought into ADA compliance. *Pl.'s SAF* ¶ 109. He believed that even if the ramp/landing/platform had been installed, the room still would not have complied with the ADA. *Id*. Mr. Fiedler did not contact any other Bar Harbor hotels to inquire about room availability and/or accessibility, either before or after the cancellation of The Harborside reservation, concerning the period from August 8-16, 2006. *Def.'s SMF* ¶ 37. He has never physically visited or visually inspected The Harborside. *Id*. ¶ 36.

Mr. Fiedler has never been to Bar Harbor and did not have plans to see any particular friend, acquaintance, family member or individual with whom he had a business relationship during his trip to Maine. *Id*. ¶¶ 3, 11. Mr. Fiedler has taken numerous similar vacations over the years to other oceanside resorts. *Pl.'s SAF* ¶¶ 83, 84. Mr. Fiedler has sworn under oath that he would vacation at The Harborside should the ADA violations be corrected. *Def.'s SMF* ¶ 46; *Pl.'s SAF* ¶ 120. At the time of the Complaint, he had no plans to visit Bar Harbor.

On July 14, 2008, Mr. Fiedler initiated a lawsuit against The Harborside for ADA and Maine Human Rights Act (MHRA) violations.[6] On July 28, 2009, Ocean Properties moved for summary judgment on the sole ground that Mr. Fiedler did not have standing to bring the claim.[7]

[6] Mr. Fiedler seeks a declaration that The Harborside violated his civil rights; an injunction ordering it to stop discriminating against disabled patrons, to remove all architectural barriers that violate the ADA and the MHRA, and to educate employees in disability rights; an order that The Harborside comply with the requirements of the ADA and the MHRA; full costs, including attorney's fees and expert fees; civil damages in the maximum amount allowed under the MHRA; and, any additional relief deemed equitable and just. C*ompl*.

[7] Although The Harborside moved for judgment on both the ADA and MHRA claims, the analysis of standing under these statutes is markedly different, and neither party separately addressed Mr. Fiedler's standing under the MHRA. Unlike the ADA, the MHRA allows for the imposition of civil penalties, 5 M.R.S.A. § 4613(2)(B)(7), and Mr. Fiedler may well have standing to claim the state statutory sanction for a past wrong.

By contrast, the ADA allows solely for injunctive relief, and does not provide the private litigant with a right to a civil penalty, monetary damages, or punitive damages. 42 U.S.C. § 12188(a)(1); *Goodwin v. C.N.J., Inc.*,

*Def.'s Mot. for Summ. J.* (Docket # 21). On September 1, 2009, Mr. Fiedler filed a response objecting to Ocean Properties' motion. *Pl.'s Objection*. On September 21, 2009, The Harborside replied. *Def.'s Reply to Pl.'s Resp. in Opp'n to Mot. for Summ. J.* (Docket # 39) (*Def.'s Reply to Pl.'s Objection*). On December 21, 2009, Mr. Fiedler moved for Leave to File a Supplemental Declaration in Opposition to Defendant's Motion for Summary Judgment. (Docket # 43).

The Court held oral argument on December 28, 2009. The Court gave Marc Fiedler one week to submit additional case law to support his standing argument and Ocean Properties one week to respond. Mr. Fiedler submitted a Supplemental Memorandum on January 4, 2010. (Docket # 47). Ocean Properties responded on January 8, 2010. *Supplemental Reply* (Docket # 48) (*Supp. Reply*).

## II. THE PARTIES' POSITIONS

### A. The Harborside's Motion

The Harborside contends that Mr. Fiedler has not met his burden to demonstrate standing. First, The Harborside argues that to establish standing under the ADA, Mr. Fiedler must demonstrate that he has sustained an "injury-in-fact," proving that he has either "personally encounter[ed] the barrier to access" or that he "has actual knowledge of the barrier . . . and has been deterred from visiting the public accommodation because of that barrier." *Def.'s Mot. for Summ. J.* at 4 (quoting *Panzica v. Mas-Maz, Inc.*, No. CV-05-2595 (ARL), 2007 WL 1732123, at

---

436 F.3d 44, 50 (1st Cir. 2006) (stating that under the ADA, a "private party may obtain only forward-looking relief; damages for past harms are not available"). Mr. Fiedler has not initiated his cause of action in a representative capacity, acting at the behest of other disabled individuals who might stay at The Harborside. Instead, the standing analysis for Mr. Fiedler's ADA claim focuses on whether Mr. Fiedler has personally sustained a wrong susceptible to remedy by the issuance of an injunction.

For purposes of this summary judgment motion, the Court, like the parties, limits its analysis to whether Mr. Fiedler has standing to bring an ADA claim. To maintain his state claims in federal court, Mr. Fiedler must have standing on the federal claims. *See Rice v. President and Fellows of Harvard College*, 663 F.2d 336 (1st Cir. 1981) (holding that the district court should have dismissed the pendent state claims when it dismissed plaintiff's federal claims).

*3 (E.D.N.Y June 11, 2007)). As Mr. Fiedler does not claim that he personally encountered the barrier to access, The Harborside focuses on the second element, "actual knowledge of the barrier." The Harborside argues that when he filed his complaint, Mr. Fiedler "had no actual knowledge. . . that the ramp designed to make the patio accessible did not comply with the ADA." *Id.* at 6.

Furthermore, The Harborside contends that knowledge of an ADA violation is alone insufficient for constitutional standing: "the 'proper analysis for standing focuses on whether the Plaintiff suffered an actual injury, not whether a statute was violated.'" *Def.'s Reply to Pl.'s Objection* at 1 (quoting *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 153 (3d Cir. 1999)). Because The Harborside would have provided a portable ramp to the balcony, there was no barrier. Thus, Mr. Fiedler could not have had knowledge "that the patio would not be accessible." *Def.'s Mot. for Summ. J*. at 6.

In addition, The Harborside observes that to seek injunctive relief, an ADA plaintiff must "show a real and immediate threat that a particular (illegal) barrier will cause future harm." *Id*. at 7 (quoting *Disabled Americans for Equal Access, Inc. v. Ferries Del Caribe, Inc*., 405 F.3d 60, 64 (1st Cir. 2005)). The Harborside points out that Mr. Fiedler "has never travelled to Bar Harbor before and has no friends or family there, but claims that he plans to spend a summer vacation in Bar Harbor and to stay at the Harborside Hotel if or when it is brought into compliance with the ADA." *Id*. at 7. Simply put, The Harborside says Mr. Fiedler's connections are "not enough." *Id*. The Harborside contends that Mr. Fiedler cannot seek injunctive relief because he has not demonstrated a threat of future harm.

**B. Marc Fiedler's Response**

Mr. Fiedler vigorously challenges The Harborside's position. First, he makes the general point that, unlike traditional constitutional standing analyses, the ADA relaxes the "Article III injury in fact requirement for standing." *Pl.'s Objection* at 14 (citing 42 U.S.C. § 12188(a)(1)). The plain language of Title III of the ADA does not require persons with a disability to "engage in a futile gesture" by visiting establishments where they will be discriminated against. *Id.* Mr. Fiedler contends that to satisfy the constitutional injury-in-fact requirement for standing, "plaintiff[s] need only show that they have knowledge of unlawful barriers to accessibility and because of those barriers are deterred from frequenting that establishment." *Id.* at 14-15 (citing *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136-37 (2d Cir. 2002)).

Regarding the "actual knowledge" requirement, Mr. Fiedler contends he "had personal knowledge of the barrier to accessibility" when he learned of the high threshold lip that both violated the ADA and would have prevented access to the balcony. *Id.* at 15. Furthermore, he contends he had knowledge that the ramp The Harborside planned to install would not have allowed him equivalent access. *Id.* He says that the law does not require him to "engage in the futile (not to mention, expensive, time-consuming, and physically strenuous) gesture of traveling to the Harborside to see with his own eyes what its managers had already described." *Id.* at 16.

Turning to the threat of future harm, Mr. Fiedler argues that once a plaintiff has actually become aware of discriminatory conditions at a public accommodation and is deterred from visiting as a result, he has suffered an injury, and this injury continues beyond the initial encounter "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred." *Id.* at 17 (quoting *Pickern*, 293 F.3d at 1136-37). If the plaintiff

states that he would patronize the defendant's establishment "if it were accessible," Mr. Fiedler contends that the plaintiff has standing. *Id.* (quoting *Pickern*, 293 F.3d at 1138).

At oral argument, Mr. Fiedler, citing *Laidlaw*, insisted that ADA plaintiffs need not demonstrate past or likely future contact with the defendant establishment and he argued that cases that have assessed these factors impose an improper burden on the ADA plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000). In effect, he contended that these courts require plaintiffs to engage in the futile gesture the law expressly does not require. He cited *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972) as support for his forcefully pressed contention that Congress had the ability to change what constituted injury-in-fact under the ADA, and Congress intended an ADA plaintiff who is deterred from an establishment because of an ADA violation to have standing, regardless of whether the plaintiff had visited the establishment or had concrete plans to do so.

## III. DISCUSSION

### A. Summary Judgment

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c)(2). The burden to prove both elements is on the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding whether a genuine issue of material fact exists, courts must "view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor." *Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004). Summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.

**B. Standing**

The Court applies a three-element test to determine whether a dispute presents a case or controversy sufficient to give the Court jurisdiction under Article III of the Constitution:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of….Third, it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted). When determining standing, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id*. at 561. The burden changes with the stages of litigation; in response to a summary judgment motion, the plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id*. (internal citations and quotations omitted). The Supreme Court has instructed courts to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, "complaints by private persons are the primary method of obtaining compliance with the Act." *Trafficante*, 409 U.S. at 209.

**C. Injury-in-Fact**

**1. Concrete and Particularized**

Disabled persons endure a concrete and particularized injury when they "suffer an injury as a result of the [defendant establishment's] noncompliance with the ADA." *Pickern*, 293 F.3d at 1138). Because Congress specifically excused disabled plaintiffs from having to experience discrimination first-hand by engaging in the "futile gesture" of visiting a non-compliant

establishment, 42 U.S.C.A. § 12188(a)(1), courts hold that the "concrete and particularized" requirement is met when a disabled plaintiff "is currently deterred from attempting to gain access to the [defendant's establishment]." *Pickern*, 293 F.3d at 1138. Thus, Mr. Fiedler's decision not to stay at The Harborside, if made because of the hotel's ADA violations, is a sufficiently concrete and particularized injury to confer standing.

The Harborside contends Mr. Fiedler's decision was made independently from The Harborside's alleged ADA violations because Mr. Fiedler had no knowledge of any barriers when he canceled his reservation. The Court agrees that a critical element of deterrence is knowledge of the barrier. *Ferries Del Caribe*, 405 F.3d at 64 (excusing the futile gesture only when the disabled plaintiff had "actual notice that [Defendant] does not intend to comply with [the ADA]"); s*ee Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) ("Although plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, they must at least prove knowledge of the barriers.") (internal citation omitted). However, the Court concludes that the record, construed in the light most favorable to Mr. Fiedler, supports a finding of sufficient knowledge.

Mr. Fiedler had knowledge of an ADA violation when he canceled his reservation at The Harborside. The parties acknowledge that the ADA Accessibility Guidelines for Building and Facilities (ADAAG) requires doors to hotel balconies to have a maximum threshold height of three-fourths of an inch, unless necessary to protect the room from weather. *Pl.'s Objection* at 3-4; *Def.'s Reply to Pl.'s Objection* at 2.[8] Mr. Fiedler learned from Mr. Moulton that the threshold

[8] The ADAAG proscribes that handicap accessible hotel units are required to make "patios, terraces, or balconies" part of an accessible route complying with Rule 4.3. ADAAG, 28 C.F.R. Pt. 36, App. A, § 9.2.2(6)(d) (1994). Rule 4.3.9 states that "doors along an accessible route shall comply with 4.13." *Id*. § 4.3.9. Rule 4.13.8 orders that door thresholds "shall not exceed ¾ in (19 mm) in height for exterior sliding doors." *Id*. § 4.13.8. The provision that doors have a threshold lower than three-fourths of an inch does not apply to Rule 9.2.2(6)(d), however, "where it is necessary to utilize a higher door threshold or a change in level to protect the integrity of the unit from wind/water damage." *Id*. § 9.2.2(6)(d). In such instances, hotels must provide equivalent facilitation, such as a ramp. *Id*.

on his reserved room's balcony door was five and one-half inches high, and he alleges that Mr. Salvatore specifically told him that the "5 ½" height of the tracks for the exterior sliding doors was not necessary to protect guestrooms from wind or water damage." *Aff. of Marc Fiedler* ¶ 50.[9] Mr. Fiedler states he knew The Harborside was in violation of the ADA because "[t]he only exception I was aware of to this [threshold height] requirement—where it is necessary to utilize a higher door threshold to protect the integrity of the room from wind or water damage—did not apply." *Id.* ¶ 54.

The Harborside argues that should the Court find knowledge of an ADA violation, Mr. Fiedler had no knowledge of a barrier because the ramp would have provided equivalent access. *Def.'s Reply to Pl.'s Objection* at 3-4.[10] Even assuming that Mr. Fiedler must prove knowledge of a barrier, not just an ADA violation, the Court finds that he meets this additional burden.[11] If

---

[9] Although Mr. Salvatore contests this statement in his Affidavit, Mr. Fiedler's conflicting affidavit raises a question of material fact on this issue. Compare *Aff. of Eben Salvatore* ¶ 5 with *Aff. of Marc Fiedler* ¶ 50.

The Court declines to take judicial notice of the fact "that a ground floor unit facing East/Northeast, only 25 feet from the Atlantic Ocean in Bar Harbor, Maine is going to be susceptible to wind/water damage from an exterior door unless the threshold is raised over the ground level." *Mot. for Summ. J.* at 6 n.4. The cases cited by The Harborside involve judicial notice of more general weather conditions. *See, e.g.*, *Rio Grande Silvery Minnow v. Keys*, 469 F. Supp. 2d 973, 988 n.12 (D.N.M. 2002) (taking judicial notice of the dry weather conditions in the Rio Grande). Despite the potential for coastal storm damage, the effect on door threshold height is beyond common knowledge. Fed. R. Evid. 201.

[10] Defendant contends that the ADAAG guidelines recognize that a portable ramp provides equivalent access: when the weather exception applies, equivalent access, in the form of a ramp or raised decking, must be provided. *Supp. Reply* at 1 (citing ADAAG § 9.2.2). The question remains whether *the ramp the defendant planned to provide* afforded equivalent access.

[11] The parties contest whether Mr. Fiedler must allege knowledge of a barrier or only an ADA violation. However, the Court does not find this issue dispositive: Mr. Fiedler has standing even if he must allege knowledge of a barrier.

On the one hand, Article III injury "may exist solely by virtue of statues creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (internal quotations omitted); *Defenders of Wildlife*, 504 U.S. at 580 (Kennedy, J., concurring) (remarking how "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before, and I do not read the Court's opinion to suggest the contrary view"). Here, Congress has arguably created a statutory right to accessible facilities that conform to ADA guidelines, the violation of which confers standing to sue. *Parr v. L & L Drive-Inn Restaurant*, 96 F. Supp. 2d 1065, 1079 (D. Haw. 2000) (stating that an alleged violation of the ADA "is an injury sufficient to give rise to an Article III case or controversy"); *Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 762 (D. Or. 1997) (stating how traditional standing principles lead to absurd results in the context of the ADA—an individual person might not be able to challenge the lack of visual fire alarms because there is no actual injury absent a fire).

On the other hand, the boundary of Congress' ability to create statutory injury that fulfills Article III requirements is not well defined. *Defenders of Wildlife*, 504 U.S. at 578 (Scalia, J., plurality opinion) ("Statutory

the evidence is viewed in the light most favorable to Mr. Fiedler, the portable ramp described by Mr. Moulton would not have provided equivalent access. Mr. Moulton stated the ramp would block access to one side of the bed, end on uneven ground, and have no railings. Although The Harborside responds that Mr. Moulton's description was inaccurate and was later corrected by Mr. Brestle and Mr. Salvatore, *Def.'s Mot. for Summ. J.* at 5-6, contradictions between Mr. Moulton and Messrs. Brestle and Salvatore create a question of fact, which at this stage must be resolved in favor of Mr. Fiedler.[12]

---

broadening of the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury. Whether or not the principle set forth in *Warth* can be extended beyond that distinction, it is clear that in suits against the Government, at least, the concrete injury requirement must remain.") (internal quotations and citations omitted). Many ADA cases find a violation of the ADA alone insufficient for standing, instead requiring an actual barrier to accessibility. *See, e.g.*, *Doe*, 199 F.3d at 153 (stating how "[t]he proper analysis of standing focuses on whether the plaintiff suffered an actual injury, not on whether a statute was violated"); *Kramer v. Midamco*, 656 F. Supp. 2d 740, 750 (N.D. Ohio 2009) (granting summary judgment for defendant where the plaintiff identified ADA violations but "provided no legitimate evidence to show that she suffered any actual injury"); *Levy v. Mote*, 104 F. Supp. 2d 538, 544 (D. Md. 2000) (stating how a "mere violation of the ADA does not alone establish injury").

Although not directly resolving this issue, the First Circuit has intimated that it does not view the constitutional and statutory requirements as in conflict. *See Ferries del Caribe*, 405 F.3d at 65 n.7 (stating that "[w]e have recognized the similarity between the standing requirement and the standard for determining the availability of a private right of action to enforce Title III"); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 306 (1st Cir. 2003) (stating that that real and immediate threat standard "has been adapted from generic Supreme Court precedents discussing whether a plaintiff has standing to protest a particular activity"). If there are shades of distinction between constitutional and statutory standing requirements for ADA claims, the Court need not decide this issue for purposes of this motion.

[12] Mr. Brestle stated that the ramp would extend 66" into the guest room, not compromise the room, and end on a "pseudo-balcony." Mr. Salvatore stated that the ramp would stretch 66" into the room, not compromise the room, and end on a platform on the balcony. First, although confirming Mr. Moulton's measurement, Mr. Brestle and Mr. Salvatore concluded that the ramp would not compromise access to the bed. Without different measurements or a reason for their opposite conclusion, Mr. Fiedler could not be sure that the portable ramp would have provided equivalent access.

In addition, although The Harborside argues that the statements by Mr. Moulton were corrected by later conversations, later in time conversations do not necessarily refute earlier statements. Mr. Moulton was Assistant General Manager, Matt Brestle was General Manager, and Mr. Salvatore was Director of Operations; all three employees were in managerial positions and could reasonably be assumed to have knowledge of the portable ramp (or admit a lack of knowledge). Although the parties agree that, among the three, Mr. Salvatore was most familiar with the portable ramp, Mr. Salvatore's greater knowledge does not preclude Mr. Moulton and Mr. Brestle from also being knowledgeable.

Finally, inconsistencies between Mr. Brestle and Mr. Salvatore's statements undermine The Harborside's argument that Mr. Moulton's erroneous statements were corrected. Instead, presented with three different versions, Mr. Fiedler was left unsure whether any of the statements, let alone Mr. Salvatore's, reflected the actual access provided by the ramp

Viewing the evidence in the light most favorable to Mr. Fiedler, when he canceled his room reservation, Mr. Fiedler had actual knowledge of an ADA violation that would have barred full access to his room at The Harborside.

**2. Actual or Imminent**

In *Ferries del Caribe*, the First Circuit summarized how the "actual or imminent" requirement of injury-in-fact for injunctive relief is met under the ADA:

> '[A] disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA' and 'who is threatened with harm in the future because of existing or imminently threatened noncompliance with the ADA' suffers actual or imminent harm sufficient to confer standing.

*Ferries del Caribe*, 405 F.3d at 64 (quoting *Pickern*, 293 F.3d at 1138). Although the First Circuit did not clearly distinguish between the requirements for actual versus imminent harm, the Ninth Circuit in *Pickern* did:

> We hold that a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.' Similarly, a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers 'imminent injury.'

*Pickern*, 293 F.3d at 1138. Thus, where, as here, an ADA plaintiff alleges actual injury, he must establish he is "currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA." *Id.*[13]

***a. Lyons, Defenders of Wildlife, and Laidlaw***

The distinction between alleging an actual versus an imminent injury is subtle but significant, as evidenced by the different outcomes in *Lyons*, *Defenders of Wildlife*, and *Laidlaw*.

[13] What emerged from *Pickern* has been called the "deterrent effect doctrine," which the Ninth Circuit recently defined: "when a disabled person encounters accessibility barriers in a facility and would return to that facility if it were accessible, he or she has been injured by the deterrent effect of the barriers actually encountered." *Chapman v. Pier 1 Imports (U.S.), Inc.*, 571 F.3d 853, 857-58 (9th Cir. 2009).

In *City of Los Angeles v. Lyons*, the Supreme Court addressed whether a plaintiff who had endured a brutal "chokehold" at the hands of the police could seek an injunction barring the police from using such tactics in the future. 461 U.S. 95, 97-98 (1983). The *Lyons* Court found the plaintiff lacked standing. *Id.* at 105. Acknowledging that Mr. Lyons had suffered a past wrong, the Court emphasized: "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). Because Mr. Lyons had failed to demonstrate that "he is realistically threatened by repetition of his experience of October 1976 . . . he has not met the requirements for seeking an injunction in federal court." *Id.* at 109.

In *Defenders of Wildlife*, the Supreme Court expanded on what a plaintiff must allege to prove imminent injury. The plaintiffs challenged a regulation that would have withdrawn Endangered Species Act protections from actions taken by the United States in foreign countries. *Defenders of Wildlife*, 504 U.S. at 558-59. The plaintiffs did not allege they had suffered or were currently suffering an actual injury from the regulation. Instead, they alleged their injury was imminent because they intended to return to the affected areas in the future. *Id*. at 562-64.[14]

The *Defenders of Wildlife* Court concluded that neither plaintiff had satisfied the "imminent injury" requirement:

> Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects. And the affiants' profession of an 'inten[t]' to return to

[14] One plaintiff stated that she had traveled to Egypt in 1986, observed the traditional habitat of the endangered Nile crocodile, intended to do so again, and hoped to observe the crocodile directly. *Id.* at 563.

Another stated that she had been to Sri Lanka in 1981 and had observed the habitat of endangered species there. She said she intended to return to Sri Lanka in the future and hoped to be more fortunate in spotting at least the endangered elephant and leopard. When asked at her deposition whether she had any plans to return to Sri Lanka, she replied that "I intend to go back to Sri Lanka" but confessed she had no current plans: "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future." *Id.* at 563-64.

> the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.

*Id.* at 564 (internal citations and quotations omitted; emphasis in original) (quoting *Lyons*, 461 U.S. at 102). Because injury turned on whether an event would occur in the future, the allegation of future harm had to be more specific than "some day" intentions.

In *Laidlaw*, on the other hand, the Supreme Court found that plaintiffs had standing despite their lack of concrete intentions to return. *Laidlaw*, 528 U.S. at 180-88. The plaintiffs had brought a Clean Water Act claim against a factory that was polluting a nearby river. The plaintiffs alleged they were currently injured because the pollution actively deterred them from using the river. *Id*. at 181-83.

Distinguishing *Defenders of Wildlife*, the *Laidlaw* Court stated that the

> affiants' conditional statements—that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it—[cannot] be equated with the speculative "'some day' intentions" to visit endangered species halfway around the world that we held insufficient to show injury in fact in [*Defenders of Wildlife*].

*Id.* at 184. In other words, because the plaintiffs alleged an actual injury in the form of current deterrence, the Supreme Court did not require the same specific intentions to return that were necessary to show imminent injury.[15]

**b. Necessary Proof**

---

[15] The *Laidlaw* Court also distinguished *Lyons* on the basis of future versus ongoing injury:

> In *Lyons*, we held that a plaintiff lacked standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat from the policy. . . . Here, in contrast, it is undisputed that Laidlaw's unlawful conduct—discharging pollutants in excess of permit limits—was occurring at the time the complaint was filed.

*Id.* Although making this argument in the context of whether the plaintiffs' "reasonable fear" of harm was sufficient for standing, the general point remains relevant: the plaintiffs in *Laidlaw* were excused from alleging future harm because their injuries were ongoing.

The Parties do not contest the standard for establishing an actual injury under the ADA but rather disagree about how ADA plaintiffs establish they are currently deterred from visiting a defendant's establishment.[16] Equating his situation to the plaintiff's in *Laidlaw*, Mr. Fiedler argues he can establish an actual injury by merely stating "that he would patronize Defendant's establishment 'if it were accessible.'" *Pl.'s Objection* at 17 (quoting *Pickern*, 293 F.3d at 1138) (internal citations and quotations omitted). He bases this argument on the framework of the ADA: because Congress excused the need to engage in the "futile gesture" of visiting an establishment known to be inaccessible, Congress necessarily excused both the need to visit and the need to return "to an inaccessible place of public accommodation in order to satisfy the standing requirement." *Id.* at 18 (quoting *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1037 (9th Cir. 2008)). According to Mr. Fiedler, to require a concrete connection to the defendant establishment effectively requires a defendant to make some futile gesture, in contravention of congressional intent.

The Court agrees with The Harborside that something beyond "Plaintiff's bald assertion" is required. *Def.'s Reply to Pl.'s Objection* at 8. The Supreme Court has placed the burden of establishing standing on "[t]he party invoking federal jurisdiction." *Defenders of Wildlife*, 504 U.S. at 561. Although the "manner and degree of evidence required" changes "at the successive stages of the litigation," by the time the case has reached summary judgment, *Defenders of Wildlife* explained:

> In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the motion will be taken as true.

[16] Both parties acknowledge that an ADA plaintiff suffers an injury when "[he] has actual knowledge of the barrier complained of and has been deterred from visiting the public accommodation because of that barrier." *Def.'s Mot. for Summ. J.* at 4; *Pl.'s Objection* at 16-17. Although the parties framed the disagreement in relation to whether Mr. Fiedler could get injunctive relief the question is the same: what facts must Mr. Fiedler allege to prove an on-going injury that can be redressed by injunctive relief.

*Id.* (internal quotations and citations omitted). "Specific facts" are required.

At oral argument, Mr. Fiedler responded that *Trafficante* made such additional facts unnecessary. *Trafficante*, 409 U.S. 205. Starting with the premise that Article III does not specify how injury must be proven, he argued that Congress was free to change traditional standing requirements by statute. Mr. Fiedler concluded that Congress had done just that in the context of the ADA: *Trafficante* instructed that Congress intended to expand ADA standing to the outer limits of Article III requirements.

In *Trafficante*, the Supreme Court held that a white plaintiff had standing to bring suit under the Civil Rights Act provision that prohibited discriminatory rental practices. The white plaintiff's alleged injury was "the loss of important benefits from interracial associations." *Id.* at 209-10. Although not cognizable at common law, the Supreme Court found that Congress had created new legal rights when it enacted the Civil Rights Act, implicitly concluding that Congress could expand understandings of injury (and hence standing) via statute. *See O'Shea*, 414 U.S. at 495 n.2 (describing the effect of *Trafficante*'s holding on standing). Interestingly, no language in the Civil Rights Act specified that Congress meant to create this interest. Rather, the Supreme Court allowed the claim because "complaints by private persons are the primary method of obtaining compliance with the Act," and the statutory language showed a "congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante*, 409 U.S. at 209 (citation omitted).

Mr. Fiedler is correct that the understanding of congressional intent in *Trafficante* translates into broad standing for ADA plaintiffs. In *Dudley*, the First Circuit commented that the ADA's "remedies mirror those contained in Title II of the Civil Rights Act of 1964. In enacting the latter statute, Congress evinced its understanding that 'enforcement would prove

difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance.'" 333 F.3d at 307 (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401 (1968)). These principles entitle Mr. Fiedler to proceed in federal court without the usual concerns of prudential standing and they also entitle him to a sympathetic view of his standing to sue.

However, these principles do not entitle Mr. Fiedler to avoid Article III's case or controversy limitation altogether. On its facts, *Trafficante*, which dealt with congressional authority to expand what is considered a cognizable injury, is dissimilar from this case, which deals with whether an injury was actually suffered. Congress cannot "bestow the right to sue in the absence of any indication that invasion of the statutory right has occurred or is likely to occur." *O'Shea*, 414 U.S. at 495 n.2 (1974). Although Congress has excused disabled plaintiffs from making "futile gestures," they still must have suffered actual injury. At summary judgment, Mr. Fiedler must provide something more than a general assertion that he would visit The Harborside if it was ADA compliant.

**c. Specific Facts**

Mr. Fiedler swears under oath that he intends to visit The Harborside if it is brought into ADA compliance:

> [I] intend to spend a summer vacation in Bar Harbor and to stay at the Harborside Hotel and Marina if and when it is brought into compliance with the ADA.

*Pl.'s SAF* ¶ 120; *see Aff. of Marc Fiedler* ¶ 59. Mr. Fiedler buttresses his statement by stating that he travels frequently, reciting areas throughout the United States and Canada he has visited. More specifically, he says that he frequently travels to places like Bar Harbor near the waterfront. *Pl.'s SAF* ¶¶ 83, 84. He also asserts that after successful ADA litigation, he often patronizes establishments that have corrected the ADA deficiency, and he provided a list of

establishments he has patronized after a satisfactory resolution. *Pl.'s SAF* ¶¶ 61-63, 67, 69-73, 76(a)-(c), 77(c)-(f), (h)-(i).

In the usual summary judgment context, these statements would easily carry the day. *Velázques-García v. Horizon Lines of Puerto Rico, Inc*., 473 F.3d 11, 18 (1st Cir. 2007) (overturning a grant of summary judgment because a "party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment"). Yet, in a motion for summary judgment challenging the plaintiff's standing, the Supreme Court has placed the burden to demonstrate standing on the plaintiff by requiring "specific facts." *Defenders of Wildlife*, 504 U.S. at 561. In this unusually close case, the Court finds that Mr. Fiedler has marshaled evidence that barely ekes by the "specific facts" requirement. He has demonstrated a past pattern of staying in similar resorts and in patronizing conforming establishments. Taken together, these facts minimally sustain his burden to demonstrate he "is currently deterred from patronizing" The Harborside due to its failure to comply with the ADA, and he is "threatened with harm in the future because of existing or imminently threatened noncompliance with the ADA." *Ferries del Caribe*, 405 F.3d at 64 (quoting *Pickern*, 293 F.2d at 1138).

The Court recognizes that this analysis varies slightly from how some district courts determine whether a "Plaintiff intends to return." *Ferries Del Caribe*, 405 F.3d at 64. In *Harris v. Stonecrest Care Auto Ctr., LLC*, the district court focused on four factors:

> In determining whether a plaintiff's likelihood of returning to a particular establishment is sufficient to confer standing, courts have examined factors such as: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definiteness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the accommodation in question.

472 F. Supp. 2d 1208, 1215-16 (S.D. Cal. 2007). Compared against the four *Stonecrest Care Auto* factors, Mr. Fiedler has failed to demonstrate a likelihood of returning. Regarding proximity, the hotel is in Bar Harbor, Maine; Mr. Fiedler lives in Washington, D.C. *Def.'s SMF* ¶ 1; *Pl.'s SAF* ¶ 1.[17] Regarding past patronage, Mr. Fiedler has never previously patronized The Harborside. *Def.'s SMF* ¶ 3; *Pl.'s SAF* ¶ 3. Regarding the definiteness of his plans to return, Mr. Fielder has stated that he "intend[s] to spend a summer vacation in Bar Harbor and to stay at the Harborside Hotel and Marina if and when it is brought into compliance with the ADA." *Pl.'s SAF* ¶ 120; *Aff. of Marc Fiedler* ¶ 59. Regarding the frequency of his travel near The Harborside, Mr. Fiedler has never been to Bar Harbor, Maine. *Def.'s SMF* ¶ 3; *Pl.'s SAF* ¶ 3.

However, the district court in *Stonecrest Care Auto* was issuing findings of fact and conclusions of law pursuant to Rule 52(a) and was free to make judgments about the credibility of the plaintiff's statements. *Stonecrest Care Auto*, 472 F. Supp. 2d at 1209.[18] This case is at the summary judgment stage, which requires a different calculus. Even so, the Court concedes that some courts, evaluating similar facts in the context of summary judgment, have applied the *Stonecrest Care Auto* factors and found the plaintiff failed to demonstrate standing. *See Kramer*, 656 F. Supp. 2d at 747-48; *Bodley v. Plaza Management Corp.*, 550 F. Supp. 2d 1085, 1088 (D. Ariz. 2008); *Wilson v. Kayo Oil. Co.*, 535 F. Supp. 2d 1063, 1066-70 (S.D. Cal. 2007) (discussing each factor); *Norkunas v. Wynn Resorts Holdings, LLC*, No. 2:07-cv-00096-RLH-

[17] There is authority to the effect that this first factor—proximity to residence—does not apply to hotels. *Bodley*, 550 F. Supp. 2d at 1088 n.4 (stating that the "proximity factor is not applicable in the hotel context"). The Court disagrees that proximity is never applicable. The better view is expressed in *D'Lil* that "distance is significantly less relevant where hotels are at issue." *D'Lil*, 415 F. Supp. 2d at 1056. Seeking a room in a hotel across the street from the plaintiff's mother's residence seems different than seeking one at the other end of the country, and this fact could be relevant to the underlying question, which is whether the past discrimination is "[]likely to recur." *Dudley*, 333 F.3d at 304.

[18] For example, the district court found it less than credible that the plaintiff who resided six hundred miles away from the defendant's convenience store really intended to patronize it in the future. *Stonecrest Care Auto*, 472 F. Supp. 2d at 1209.

PAL, 2007 WL 2949569, at *3-5 (D. Nev. Oct. 10, 2007) (dismissing claim on motion to dismiss); *Harris v. Del Taco, Inc.*, 396 F. Supp. 2d 1107, 1113 (C.D. Cal. 2005).[19]

What concerns the Court is that to conclude Mr. Fiedler has not met his burden under *Defenders of Wildlife* to produce "specific facts," the Court would have to draw conclusions about Mr. Fiedler's credibility; in other words, the Court would have to disbelieve his statements about his past practices and his present intentions. If Mr. Fiedler is going to be disbelieved on the issue of standing, it should be in the context of factfinding, not in the context of summary judgment. With this said, there is much in this record that suggests Mr. Fiedler is not being entirely candid when he says he intends to come to Bar Harbor, and the standing issue does not evaporate with the resolution of this motion. Instead, the Court retains the obligation to monitor Mr. Fiedler's standing to bring suit and to assess whether he has borne his burden when his credibility is to be weighed and facts are to be found.

**D. Redressablity**

Interwoven in the requirement of an intention to return in the future is the concept of redressability. Section 121188(a)(1) of the ADA incorporates the remedies set forth in 432 U.S. C. § 2000a-3(a), which "allows only injunctive relief (as opposed to money damages)." *Dudley*, 333 F.3d at 304. Similar to the requirement of an "actual or imminent" injury, a court cannot enjoin an act that is not ongoing or will not take place. Thus, in *Dudley*, the First Circuit explained: "[the ADA] is not intended to provide redress for past discrimination that is unlikely to recur . . . It therefore requires some ongoing harm (or, at least, a colorable threat of future

[19] At the same time, the decisions in many cases rest on unique facts. For example, in *Bodley*, the plaintiff testified that if the hotel became ADA compliant, he would "look into" holding a meeting there, and the district court concluded that his "some day intentions" did not confer standing. *Bodley*, 550 F. Supp. 2d at 1087-89. Similarly, in *Wilson*, the district court relied on the fact that the defendant resided five hundred miles from the defendant's gas station, and that the defendant "fails to explain why he needs to travel such a long distance to buy a $.30 gum at Circle K/76." *Wilson*, 535 F. Supp. 2d at 1068.

harm). Otherwise an injunction would be pointless." *Id.* (citations omitted). However, in cases, such as this one, where a plaintiff has alleged an ongoing barrier to access, the injury is ongoing so long as "the barrier remains in place." *Id*. at 305. Although the Court has for the moment concluded that Mr. Fiedler suffers from an ongoing injury, it remains to be seen whether he succeeds in convincing the Court that with an injunction in place he would actually visit The Harborside.

**E. Summary**

The resolution of this motion turns on the confluence of four strands of law. The first and more significant is the procedural context of the case. In ruling on a motion for summary judgment, the Court is mandated to view the evidence in the light most favorable to the nonmovant, here Mr. Fiedler, and to draw all reasonable inferences in his favor. *Flowers*, 359 F.3d at 29. This means, in effect, that within limitations, the Court must take Mr. Fiedler at his word, and accept his sworn declaration supported by specific facts that once The Harborside addresses the asserted ADA violation, he will come to Bar Harbor and will stay there as a paying guest.

The second is found in congressional intent: the futile gesture provision of the ADA statute itself and the congressional understanding that ADA enforcement "would have to rely in part upon private litigation as a means of securing broad compliance." *Dudley*, 333 F.3d at 307. Within the limits of Article III standing requirements, Congress encourages individuals like Mr. Fiedler to initiate ADA claims, excusing them from engaging in the futile gesture of actually visiting the establishment known to be inaccessible. 42 U.S.C. § 12188(a)(1); *Dudley*, 333 F.3d at 305 (stating that the futile gesture provision "is designed to protect a disabled plaintiff from

having to shoulder an undue evidentiary burden"). As the First Circuit wrote in *Dudley*, Congress "clearly meant not to overburden Title III claimants." *Id.* at 307.

The third is the Supreme Court's directive to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits "are the primary method of obtaining compliance with the Act." *Trafficante*, 409 U.S. at 209.

The fourth countervailing strand is the placement of the burden on Mr. Fiedler to prove standing and the more express obligation under *Defenders of Wildlife* to present "specific facts" in support of his invocation of federal jurisdiction. *Defenders of Wildlife*, 504 U.S. at 561.

The interweaving of these four strands and the extreme paucity of specific facts in Mr. Fiedler's filings make The Harborside's motion for summary judgment an especially difficult one. There is much in the record of this case that gives the Court considerable pause, but in the end, the Court determines that summary judgment is not the place to make credibility determinations.

## III. CONCLUSION

The Court DENIES Ocean Property's Motion for Summary Judgment (Docket # 21). The Court further DENIES Marc Fiedler's Motion for Leave to File Supplemental Declaration in Opposition to Defendant's Motion for Summary Judgment as moot. (Docket # 43).[20]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 8th day of February, 2010

[20] On December 21, 2009, Mr. Fiedler filed a motion for leave to file supplemental declaration. *Pl.'s Mot. for Leave to File Supplemental Decl. in Opp'n To Def.'s Mot. for Summ. J.* (Docket # 43). The Harborside objected. *Def.'s Opp'n to Pl.'s Mot. for Leave to File Supplemental Decl. in Opp'n to Def.'s Mot for Summ. J.* (Docket # 44). Mr. Fiedler replied. *Reply to Opp'n to Pl.'s Mot. for Leave to File Supplemental Decl. in Opp'n to Def.'s Mot for Summ. J.* (Docket # 45). The Court DENIES the Plaintiff's motion. It has ruled in his favor without reference to its contents.